THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILSON B. ZIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 6930 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wilson B. Zia moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse the final decision of the Commissioner of the Social Security Administration (Commissioner), who denied his claim for a period of disability and Disability Insurance Benefits (DIB). See 42 U.S.C. § 401 et seq. (West 2008). In the alternative, Plaintiff seeks an order remanding the case to the Commissioner for additional proceedings. Defendant Commissioner filed a Cross-Motion for Summary Judgment. For the reasons set forth below, the Court denies Plaintiff's Motion for Summary Judgment and grants the Commissioner's Cross-Motion for Summary Judgment.

## Procedural History

On December 9, 2005, Mr. Zia filed an application for a

period of disability and DIB, alleging disability beginning May 12, 2004. (R. at 70.) He asserted that disorders of the spine rendered him disabled. Specifically, Plaintiff contended that he has herniated discs and a bulging L3-14 [sic] disc. (R. at 32.) His claim was denied on February 28, 2006. (R. at 28.) On March 6, 2006, Mr. Zia filed a Request for Reconsideration, which was denied on April 10, 2006. (R. at 33, 37.)

On April 13, 2006, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. at 36.) A hearing was held on June 13, 2007, before ALJ Robert C. Asbille. (R. at 18, 25.) Following the hearing, the ALJ issued an unfavorable decision, finding Plaintiff not disabled at any time through June 29, 2007, the date of the ALJ's decision. (R. at 15-25.) Plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council (Appeals Council). (R. at 10-11.) The Appeals Council denied the request on October 10, 2007. (R. at 4-6.) Consequently, the ALJ's decision stands as the final administrative determination of the Commissioner. (R. at 4.)

## Factual History

### 1. Plaintiff's Background and Testimony

Wilson B. Zia was born on March 27, 1960, and was 47 years old at the time of the ALJ's decision. (R. at 70, 421.) He stands approximately 5 feet 9 inches tall and weighs 189 pounds.

2

(R. at 421.)  He neither drinks nor smokes.  (R. at 427.)
Plaintiff is married and lives with his wife and two young
daughters.  (R. at 422.)

Mr. Zia attended high school until the eleventh grade.  (R.
at 423.)  He worked as a dishwasher at White's Cafeteria from
1976 to 1979.  (R. at 118.)  For the next nine years - 1980 to
1989 - he worked in shipping and receiving, loading and unloading
trucks.  (*Id.*)  From 1990 to 1999, Plaintiff again worked in a
position in which he loaded and unloaded trucks, this time at a
Walmart distribution center.  (*Id.*)  Mr. Zia worked at John O.
Butler as a materials handler for the five years prior to his
alleged injury.[1]  (R. at 423.)  This job required that he lift
boxes, push and pull skids, and order and ship materials.  (*Id.*)
At the hearing before ALJ Asbille, Mr. Zia testified that since
the alleged onset date of his disability - May 12, 2004 - he
returned to work for two days.  (R. at 432.)  Because he was

---

[1]  Mr. Zia appears to refer interchangeably to John O.
Butler and Sunstar.  At his hearing before the ALJ, Plaintiff
testified that he worked at John O. Butler for five years prior
to the onset of his alleged disability.  (R. at 423.)  However,
when listing prior employment, Mr. Zia indicated that he was
employed by Sunstar of America during this same period.  (R. at
118.)  Further, the record contains correspondence from Sunstar
Butler regarding Plaintiff's employment during this time.  (R. at
229, 236.)  The Court resolves this inconsistency by noting that
John O. Butler is a subsidiary of Sunstar.  Sunstar,
http://jp.sunstar.com/e1.0_about/e1.4_about_history.html
(last visited Dec. 1, 2008).  While this is of no consequence and
has no impact on the Court's decision, the Court makes this
distinction for purposes of clarification.

3

unable to perform his same job, his employer offered a lighter job as an accommodation. (R. at 433.) When he was unable to perform that job, he was asked to resign. (*Id.*)

When discussing his physical limitations and impairments, Mr. Zia testified that his leg stiffens and becomes numb. (R. at 423.) As a result, he is unable to stand for more than ten minutes. (R. at 427.) And though he experiences pain in both legs, the pain in his right is greater. (R. at 431.) Plaintiff is not only unable to stand for extended periods - back pain and the need to change positions also prevents him from sitting for more than ten minutes. (R. at 423, 427-28.) If he happens to sit for a longer period of time, Mr. Zia indicated that it will be extremely painful when he rises from his seat. (R. at 431.)

Mr. Zia stated that in an attempt to alleviate, *inter alia*, sleeplessness and pain, he takes prescription medications, including Ambien, Darvocet, Flexeril, and Mobic. (R. at 424.) To further relieve his pain, Plaintiff received three injections in his back, though he had not undergone surgery. (*Id.*) He last saw his physician on May 12, 2007; at that time, he was told to return in three months. (R. at 425.) Despite these visits to the doctor's office, physical therapy, and even medication, his condition worsened. (*Id.*) And not only do the medications fail to relieve his pain, they also make Mr. Zia sleepy. (*Id.*) However, he asserted that his back pain wakes him from his sleep

4

every two to three hours. (*Id.*) While Plaintiff received workman's compensation at one time, he was no longer receiving it at the time of the hearing. (R. at 424-25.)

Mr. Zia testified that he is unable to do housework, though he admitted that he did not do so even prior to his disability, as it is customary in the Syrian culture that the wife perform these tasks. (R. at 425-26.) He cannot attend church often because the sitting and standing cause him great pain. (R. at 426.) Plaintiff stated that his back pain further restricts his daily activities, limiting him to taking his medication, lying down, and elevating his legs. (R. at 427.) He elevates his legs five to six times per day for one hour each time. (R. at 429.) Aside from the aforementioned activities, Mr. Zia does nothing during the day, in part because the pain in his back and leg prevents him from having friends. (R. at 427, 430.) It also keeps him from lifting a gallon of milk and from climbing stairs. (R. at 428.) However, Plaintiff does not experience any problems with his right or left hand; therefore, he is able to button his clothes and operate zippers. (R. at 428, 430.)

Mr. Zia stated that as a result of his back problems, his wife returned to work. (R. at 430.) Additionally, he sold his car and consequently, he no longer drives. (R. at 431.) Fortunately, both his parents and sister live in close proximity to him. (R. at 430.) As was the case prior to his disability,

Plaintiff's sister assists in the care of his children. (*Id.*)

## 2. Medical Expert's Testimony

Dr. James McKenna (McKenna), a board certified internist, testified as the medical expert (ME) at the hearing. Though Dr. McKenna did not personally examine Mr. Zia, he based his opinion on his review of the medical evidence presented.

Dr. McKenna opined that Mr. Zia's claim is primarily a pain claim. (R. at 436.) He noted that the pain originally began in December 2003 and, though it lasted for some time, was responsive to medication and physical therapy. (*Id.*) On May 17, 2004, Plaintiff presented to his physician, Dr. John N. Stamelos (Stamelos), with excruciating back pain when lifting a thirty to forty pound box. (*Id.*) Though Dr. Stamelos initially treated Mr. Zia conservatively, an MRI was subsequently ordered, which showed normal curvature. (*Id.*) Because the MRI also showed normal bone marrow signal, the ME stated, "there was no compression artifacts or anything involved, involving the vertebra." (*Id.*) Dr. McKenna indicated that there were degenerative changes of L3-4 and L5-S1 intervertebral discs, accompanied by loss of height and hydration. (*Id.*) Further, present at the L3-L4 and L4-L5 was a posterior degenerative disc bulge/protrusion of three to four millimeters. (*Id.*) The ME stated that this caused a slight indentation of the spine and, in combination with "other changes on the ligamentum flavum and the

6

facet joints" resulted in Plaintiff having generalized neuroforaminal narrowing. (R. at 436-37.) The paravertebral tissues were normal, and while there was a bulge indent in the fecal sac, there was no indication that there was any signal change in the spine. (R. at 437.) Additionally, Dr. McKenna noted that there was neither secondary myelitis of the spine, nor any secondary spinal change. (*Id.*) He interpreted this to mean that there was no spinal irritation caused by the impingement (spinal stenosis). (*Id.*)

The ME then directed the ALJ's attention to a follow-up study that was done on April 18, 2005. (*Id.*) At that time, a myelogram was done; it indicated that there was mild encroachment on the L4 nerve root at the L3-L5, L3-L4 interspace. (*Id.*) The medical records also contain evidence of two epidural blocks, which further supported Dr. McKenna's opinion that Mr. Zia's case was one of chronic pain. (*Id.*) Further, the medical records lacked any objective evidence – results of an EMG or nerve conducting velocity – indicating that Plaintiff had radiculitis. (*Id.*) Mr. Zia's case, the ME opined, is one in which there are "inordinate complaints of pain which seem to be completely out of proportion to the objective medical evidence." (R. at 438.)

Dr. McKenna testified that Mr. Zia fails to meet or equal any of the listings, as he does not exhibit loss of reflexes or any of the other conditions that the listings require. (*Id.*)

7

However, when discussing possible restrictions on Plaintiff's work activity, the ME suggested that his residual functional capacity (RFC) be reduced to light work with occasional bending, stooping, crouching, and stair climbing. (R. at 438-40.) In making this recommendation, Dr. McKenna considered Mr. Zia's complaints of pain as well as the supporting documentation provided by Mr. Zia's physicians. (R. at 439.) He further opined that Plaintiff can lift 20 pounds occasionally, ten pounds frequently; ladder, rope, and scaffold climbing are to be avoided. (*Id.*) Dr. McKenna then testified that there were no contraindications of kneeling and crawling. (*Id.*)

Upon examination by Plaintiff's counsel, the ME indicated that his opinion regarding Plaintiff's RFC is based on the fact that the record contains no objective evidence to support Plaintiff's assertions. (R. at 440-41.) To be sure, Dr. McKenna testified that while he did not have evidence to disprove Mr. Zia's assertions, "the degree of [Mr. Zia's] pain is totally out of proportion to the objective medical evidence." (R. at 441-42.) Counsel then questioned Dr. McKenna regarding documentation in the record in which Dr. Bruce J. Montella (Montella) opined (monthly, from July 2004 to September 2005) that Mr. Zia not return to work until he had been evaluated further. (R. at 443.) Dr. McKenna responded that after reviewing the record, it was his belief that Mr. Zia was instructed not to return to work because

there was no light work available and, consequently, he would have to return to a certain level of work. (*Id.*) He acknowledged that the record contains Dr. Montella's recommendation that Plaintiff undergo surgery in an attempt to alleviate his back pain, if more conservative measures were not successful. (R. at 444.) However, based on a pain study that was conducted, it was the ME's opinion that an EMG should be performed prior to proceeding with surgery. (R. at 445-46.)

Dr. McKenna testified that Mr. Zia's assertions that it is necessary that he periodically lift his feet for periods of at least fifteen minutes, are atypical and fail to match any of the clinical descriptions. (R. at 446.) Indeed, the ME stated, "if you got 100 people with low back pain and radiculitis, you'd probably not get one of them that would say he'd have to lift his leg to get relief of his back pain." (*Id.*) He differentiated leg lifting from reclining and asserted that while Plaintiff's need to recline for fifteen minute intervals throughout the day is not consistent with the objective medical evidence, it takes the pressure off of the muscles and thus, would relieve some of the pain from Mr. Zia's degenerative changes. (R. at 447-49.) Though not conceding that Mr. Zia has sciatica (a form of radiculitis), Dr. McKenna testified that reclining would indeed relieve the pain from this disorder as well. (R. at 449.)

When discussing Mr. Zia's medications, the ME indicated that

9

Flexeril, a muscle relaxer, may very well cause Mr. Zia to feel tired. (R. at 449-50.) However, he then testified that when patients are on a medication for a sustained period of time, they sometimes develop a tolerance to it; a phenomenon he referred to as tachyphylaxis. (R. at 450.) Darvocet, he testified, is a mild narcotic and consequently, has less of a sedative effect. (*Id.*) While Flexeril and Darvocet may cause Plaintiff to feel some tiredness, Dr. McKenna asserted that it would not be "remarkable." (*Id.*)

Mr. Zia was also taking Ambien, which indicated to the ME that he has trouble sleeping. (*Id.*) Dr. McKenna was unable to state the length of time that Mr. Zia would sleep after taking the Ambien, as it depends on many factors. (R. at 451.) He did testify, however, that while severe pain could prevent the Ambien from working effectively, because Mr. Zia likely takes Darvocet at night (which helps him to sleep and be pain free), this was not likely the case. (*Id.*) While Plaintiff may experience a dart of pain that would wake him from his sleep, this would be the exception rather than the norm. (*Id.*)

During re-examination by the ALJ, the ME again addressed Dr. Montella's orders that Mr. Zia not return to work. (R. at 452.) He testified that it was his opinion that the physician gave the order because Mr. Zia's employer indicated that it was unable to accommodate any restrictions placed on Mr. Zia's return to work -

10

he either had to return to work with complete clearance or not return at all. (*Id.*) Dr. McKenna also indicated that, for varying reasons, it is not uncommon for orthopedists and neurosurgeons to treat a patient without first having the patient undergo an EMG. (R. at 452-53.) However, if an EMG had been performed and there was nerve root compression, the EMG would have showed it; if the source of the pain was something other than nerve root compression, the EMG would have appeared normal. (R. at 453.) Finally, the ME testified that while the record contains numerous references to radiculitis and though Mr. Zia's lying down is consistent with the disorder, there is no objective medical evidence to support a diagnosis of radiculitis nor Mr. Zia's need to recline frequently. (R. at 454-55.)

## 3. Vocational Expert's Testimony

Mr. William Newman, a vocational expert (VE), testified at Plaintiff's hearing. (R. at 456-57.) After reviewing Mr. Zia's prior work history, the VE concluded that Mr. Zia worked as a materials handler at multiple locations. (R. at 456.) In that capacity, he handled between 50 and 100 pounds and was responsible for "shipping, receiving and moving heavy materials." (*Id.*) Mr. Newman stated that the Dictionary of Occupational Titles (DOT) "define[s] material handler as semi-skilled, heavy work" with a Specific Vocational Preparation (SVP) rating of three. (*Id.*)

11

The ALJ described to Mr. Newman, a person of Plaintiff's age and with Plaintiff's education and work experience. (*Id.*) The hypothetical person, the ALJ said, "could do the entire universe of exertional or non-exertional work with the exception that he limits it to lifting 20 pounds occasionally, ten pounds frequently." (*Id.*) Further, while there are no limitations on the person's kneeling or crawling, the ALJ's hypothetical individual could climb stairs, stoop, and crouch only occasionally. (R. at 457.) When asked if the individual could return to his past relevant work, the VE indicated that he could not. (*Id.*) However, Mr. Newman stated that there are at least three other jobs that the hypothetical individual could perform. (*Id.*) First, he could perform light housecleaning work, of which there are approximately 20,435 positions in the Chicago metropolitan area. (*Id.*) Second, the hypothetical person could perform work as a cafeteria attendant, of which there are approximately 20,666 positions in the Chicago metropolitan area. (*Id.*) Finally, he could perform work as a fast food worker, of which there are approximately 34,063 positions in the Chicago metropolitan area. (*Id.*)

The ALJ then questioned whether that same hypothetical individual would be precluded from holding one of the three aforementioned jobs if the individual was required to lie down for fifteen to twenty minutes each day, approximately four times

12

a day. (*Id.*) Mr. Newman testified that the individual would be unable to hold any of the three jobs. (*Id.*)

## 4. Medical Evidence

Plaintiff submitted medical records to the ALJ detailing his treatment. The Court will discuss these records in full.

### A. Buffalo Grove Orthopaedic Associates

Mr. Zia visited Buffalo Grove Orthopaedic Associates (Orthopaedic Associates) on various occasions. During those visits, he was treated by different physicians at the medical practice.

On December 15, 2003, Plaintiff visited Orthopaedic Associates, having awoke that morning with lower back pain and stiffness. (R. at 127.) The report of the treating physician, Dr. Jaroslaw B. Dzwinyk (Dzwinyk), states that at the time of the visit, Plaintiff had no history of injury nor any prior back problems. (*Id.*) Upon examination, Dr. Dzwinyk noted that Mr. Zia's gait was normal, and there was a "list of the trunk to the left, prominent right paravertebral muscle spasm in the lumbar area." (*Id.*) A neurological exam of the lower extremities was normal and the SLR was negative bilaterally. (*Id.*) Plaintiff was given prescriptions for Vioxx and Skelaxin, referred for physical therapy, and advised to return for reevaluation in one week. (*Id.*)

Mr. Zia returned to Orthopaedic Associates on December 22,

13

2003, for reevaluation. (R. at 128.) He indicated to Dr. Dzwinyk that he had recently begun physical therapy. (*Id.*) The pain and stiffness had improved, but not completely subsided. (*Id.*) Plaintiff denied that he was experiencing any "neurological symptoms, distal radiation of the pain." (*Id.*) After examining Mr. Zia, Dr. Dzwinyk noted that his gait was normal, his spine straight, and his pelvis level. (*Id.*) The physician noted a mild spasm of the right paravertebral muscles. (*Id.*) Dr. Dzwinyk's report indicates that there was a reversal of lumbar lordosis. (*Id.*) Further, ROM of the lumbar spine and trunk was restricted to 0 degrees extension, 45 degrees forward flexion. (*Id.*) Plaintiff's SLR remained negative bilaterally, and the neurological exam continued to be normal. (*Id.*) Mr. Zia was advised to continue with his medications, physical therapy, and activity restriction, and instructed to return in two weeks for reevaluation. (*Id.*)

On May 17, 2004, Plaintiff returned to Orthopaedic Associates; this time, he was seen by Dr. Stamelos. (R. at 129-30.) Dr. Stamelos' notes reveal that Mr. Zia complained of "severe excruciating back pain radiating to the right buttock and thigh, especially with standing or sitting to the point where he was unable to stand or walk." (R. at 129.) The pain began at work, as Plaintiff lifted 30-40 pound boxes. (*Id.*) At the time of the visit, Mr. Zia was unable to sit; he opted instead to lie

14

with his knees flexed. (*Id.*) Pain medication provided only moderate relief. (*Id.*) Dr. Stamelos noted Plaintiff's history with a similar problem. (*Id.*) After examining Plaintiff, Dr. Stamelos opined that he had significant spasm and guarding. (*Id.*) He had positive straight-leg raising - 20° with both sitting and lying. (*Id.*) Mr. Zia was able to ambulate and denied experiencing numbness or paresthesias in the perineum and lower extremities. (*Id.*) Though diminished, his reflexes were present at the knee and ankle; he had significant forward lift. (*Id.*) Dr. Stamelos noted that Plaintiff was x-rayed five days earlier and that the X-rays were normal. (*Id.*) He then diagnosed Mr. Zia with "acute sciatica, discogenic." (*Id.*) His notes further reveal that he was to rule out a possible herniated disc. (*Id.*) The physician recommended that Plaintiff not return to work and that he take Darvocet, Flexeril, and Vioxx. (R. at 130.) Additionally, Dr. Stamelos advised Mr. Zia to begin a physical therapy program. (*Id.*) Plaintiff was instructed to return on May 25, 2004, for re-evaluation. (*Id.*)

Having begun physical therapy the day before, Plaintiff returned to Orthopaedic Associates on May 25, 2004. (R. at 131.) At the time of the visit, he was experiencing increasing spasms. (*Id.*) While Mr. Zia's leg pain was not as severe as that experienced over a year earlier, Dr. Stamelos noted its similarity. (*Id.*) Plaintiff's condition was responding

favorably to pain medication and he experienced neither bowel nor bladder dysfunction. (*Id.*) Upon examination, Dr. Stamelos noted paraspinal spasms on Mr. Zia's right side. (*Id.*) And while he showed signs of tight hamstrings, there were no tension signs present as there had been at the previous visit. (*Id.*) Plaintiff's reflexes continued to be present, though diminished. (*Id.*) Dr. Stamelos opined that Plaintiff was experiencing acute back strain. (*Id.*) The physician advised him to continue the physical therapy program, remain home from work, and take Skelaxin and Vioxx. (*Id.*)

On June 1, 2004, Mr. Zia again returned for reevaluation. (R. at 132.) Dr. Stamelos' notes indicate that Plaintiff was seeing a chiropractor rather than a therapist. (*Id.*) He was advised that he would be unable to have two different health care providers treating the same condition; Dr. Stamelos recommended that Mr. Zia see a licensed physical therapist. (*Id.*) At the time of the visit, Mr. Zia continued to have back pain with spasms. (*Id.*) Though the pain responded to Darvocet and therapy, he was still limited in standing and sitting. (*Id.*) After examining Plaintiff, Dr. Stamelos concluded that his paraspinal spasms on the right were not as intense as they had been during previous visits. (*Id.*) Further, Mr. Zia had negative straight leg raising, though he did exhibit tightness in the hamstrings. (*Id.*) Based on these findings and Plaintiff's

desire for a prognosis, Dr. Stamelos suggested that Plaintiff
have an MRI done. (*Id.*) He was to return in one week, after the
results of the MRI scan became available. (*Id.*) Additionally,
Plaintiff's leave from work was extended to at least June 13,
2004. (*Id.*)

On June 8, 2004, Mr. Zia returned to Orthopaedic Associates.
(R. at 133.) Pursuant to Dr. Stamelos' suggestion, he was seeing
a licensed physical therapist. (*Id.*) The physician opined that
the results of the MRI were "consistent with the clinical history
of injury when [Mr. Zia] bent over at work and started
complaining of intense pain in his back." (*Id.*) There were
degenerative changes of both the L3-4 and L4-5 discs, with a
"degenerative posterior disc protrusion-herniations of
approximately 3 to 4 mm without significant spinal stenosis."
(*Id.*) Also present at these levels was generalized bilateral
neural foraminal narrowing, associated with ligament flavum
hypertrophy; the remainder of the spine was unremarkable. (*Id.*)
Dr. Stamelos diagnosed Mr. Zia with disc herniations at L4-5 and
L3-4 and aggravation of underlying degenerative disc disease.
(*Id.*) The physician advised him to begin a home exercise program
and continue physical therapy. (*Id.*) While Mr. Zia was to
discontinue taking the Darvocet and Flexeril, he was instructed
to continue with the Vioxx. (*Id.*) He was to return in two
weeks; an MMI was to be performed in four to six weeks. (*Id.*)

17

On June 18, 2004, Mr. Zia returned for his follow-up. (R. at 134.) He was responding to therapy, experiencing decreasing levels of lower back pain. (*Id.*) But though the pain in his left leg was decreasing, tingling and tightness were sill present with standing and bending. (*Id.*) Paresthesias continued, off and on. (*Id.*) There was no indication of bowel or bladder dysfunction. (*Id.*) On examination, Mr. Zia exhibited "continued centralization with extension and movements." (*Id.*) Dr. Stamelos noted that at times during the exam, Mr. Zia was in so much pain that he was unable to push range of motion. (*Id.*) He recommended that Plaintiff continue his medications and exercise program. (*Id.*) Plaintiff was instructed to return in two weeks and was tentatively scheduled to return to work on July 5, 2004. (*Id.*)

On July 6, 2004, Mr. Zia was reevaluated. (R. at 135.) While his activities of daily living had improved, he reported that he still experienced centralized pain, especially with movement. (*Id.*) Consequently, he had difficulty bending and getting out of bed. (*Id.*) Per his doctor's orders, Mr. Zia attended therapy, worked on stretching, and performed therapeutic exercises. (*Id.*) He reported that Vioxx provided pain relief. (*Id.*) However, upon examination, he exhibited poor posturing with defensive movements. (*Id.*) Additionally, Mr. Zia had "tight hamstrings and weakness with right hip flexors and hip

18

abductors on the right side as compared to the left side." (*Id.*)
Dr. Stamelos noted that more of Mr. Zia's symptoms were present
on the right side as opposed to the left. (*Id.*) Plaintiff was
diagnosed as having "lumbar radiculopathy with persistent
symptomatic degenerative discs at two levels." (*Id.*) Because
there was no light duty available at Plaintiff's job, Dr.
Stamelos extended his leave from work through July 30, 2004.
(*Id.*) Mr. Zia was instructed to continue his therapy program and
to return in two weeks. (*Id.*)

On July 20, 2004, Dr. Stamelos noted that Mr. Zia's pain had
improved by about sixty percent, based on information provided by
his therapist. (R. at 136.) During examination, Mr. Zia showed
"a negative Faber's maneuver with negative straight leg raising."
(*Id.*) His flexion had improved considerably. (*Id.*) Though he
had less spasm noted on paraspinal muscle palpation, he
complained of pain and tightness with sitting, bending, and
excessive walking. (*Id.*) Dr. Stamelos recommended that
Plaintiff return to work with restricted duties. (*Id.*)
Specifically, he advised that Plaintiff lift no more than twenty-
five pounds and that he avoid excessive sitting and standing.
(*Id.*) Plaintiff was instructed to continue with the Vioxx,
complete therapy, and return for reevaluation in two weeks.
(*Id.*)

**B.    Midwest Sports Medicine & Orthopaedic Surgery, Ltd.**

On July 29, 2004, Mr. Zia visited Midwest Sports Medicine & Orthopaedic Surgery, Ltd. (Midwest). (R. at 174.) The records indicate that he had no problems prior to the injury that occurred on May 12, 2004. (*Id.*) His symptoms continued and worsened with "bending, lifting, twisting, increasing exertion and onset of fatigue." (*Id.*) Further, Mr. Zia experienced pain when coughing, sneezing, and straining. (*Id.*) Dr. Montella noted that Mr. Zia's posture was well maintained in the coronal and sagittal planes. (*Id.*) There was no forward flexion rotational deformity and his gait was non-antalgic. (*Id.*) At the time of the visit, Mr. Zia was able to steadily walk a straight line and his heel and toe walk demonstrated good strength. (*Id.*) His pelvis was level, leg lengths equal, and the Trendelenburg was negative bilaterally. (*Id.*) An SI joint stress test failed to reproduce symptomatology. (*Id.*) Plaintiff had limited lumbar flexion, limited extension, and loss of spinal rhythm. (*Id.*) He exhibited tenderness to deep palpation as well as ongoing lumbar spasm. (*Id.*) His abdomen was benign and his hips had a painless, symmetric range of motion. (*Id.*) Mr. Zia's distal pulses were palpable and there were no mechanical nerve root tension signs. (*Id.*) His motor, sensory, and reflexes were both full and symmetric. (*Id.*) There were neither pathologic reflexes of sustained clonus nor Babinski sign. (*Id.*) An MRI

scan was performed and showed degenerative changes at L3-4 and L4-5, with posterior disc protrusions/herniations without significant spinal stenosis. (R. at 175.) Also present at these levels was a generalized bilateral neuroforaminal narrowing. (*Id.*) Mr. Zia indicated at the visit that he was interested in returning to work. (*Id.*) While the treating physician cleared him to do so and encouraged him to work through aches and pains, the physician indicated that work restrictions and invasive treatment options would have to be considered if the pain worsened. (*Id.*) Mr. Zia was diagnosed as having back and radiating leg pain, as well as posterior disc protrusions/herniations. (R. at 174.)

On September 9, 2004, Mr. Zia returned to Midwest. (R. at 173.) He was diagnosed as having back and radiating leg pain in addition to disc injury and radiculitis. (*Id.*) There was no neurologic impairment and his physical exam remained unchanged from the previous visit. (*Id.*) Dr. Montella noted that Mr. Zia was benefitting from physical therapy and chiropractic care. (*Id.*) However, because his symptoms were "severe and debilitating," the physician opined that Mr. Zia should not participate at work in any way. (*Id.*)

During Mr. Zia's October 6, 2004, visit, he expressed interest in an epidural steroid injection to relieve his back pain. (R. at 172.) In addition to scheduling the procedure, the

21

physician advised Mr. Zia to "continue with physical therapy, chiropractic care, [and] avoidance of activities that aggravate his symptoms." (*Id.*) He stressed the need for good habits of spine posture and lifting body mechanics, as well as ergonomic adjustments at work. (*Id.*) The notes indicate that Mr. Zia's diagnosis was back and radiating leg pain.[2] (*Id.*)

On February 21, 2005, Mr. Zia returned to Midwest, having experienced a severe "flare." (R. at 168.) His physical exam remained unchanged and he requested consideration of surgery options. (*Id.*) In response, Dr. Montella recommended a CT-myelogram in order to determine if there were surgery options available to him. (*Id.*) Because his symptoms remained intense, the treating physician opined that Mr. Zia should remain home from work. (*Id.*)

Because Plaintiff's condition failed to improve, on April 21, 2005, Dr. Montella suggested that he undergo surgery. (R. at 167.) To determine whether Mr. Zia was a candidate for surgery, the physician recommended that he undergo a lumbar discography. (*Id.*) Mr. Zia was provided with the results of the CT-myelogram, which indicated that there was no obvious nerve root impingement present. (*Id.*)

---

[2] While Mr. Zia's diagnoses varied, the treatment notes from his visits to Midwest on November 1, 2004; November 4, 2004; November 29, 2004; August 4, 2005; September 1, 2005; and October 27, 2005, are very similar to those from previous visits. Consequently, they will not be discussed in detail.

On October 12, 2006; November 16, 2006; and May 18, 2007, Dr. Montella opined that, because Mr. Zia's symptoms continued to be severe and debilitating, he supported Mr. Zia's application for permanent disability. (R. at 399, 400, 401.) During the November 16, 2006, visit, Plaintiff expressed his interest in plasma disc decompression as a means to relieve his back pain. (R. at 400.) Dr. Montella did not believe that the procedure would result in "complete functional recovery." (R. at 400.)

On July 24, 2007, Dr. Montella completed a questionnaire in which he opined that Mr. Zia could not work at all, in part because of his need to elevate his legs frequently during an eight hour day. (R. 413.) The longest that he believed Plaintiff could sit or stand at one time was between fifteen and thirty minutes. (*Id.*) He recommended that Mr. Zia not lift anything - neither on an occasional nor frequent basis. (*Id.*) Dr. Montella also suggested that he not bend. (*Id.*) However, it was his opinion that Mr. Zia could manipulate with both his right and left hands constantly. (*Id.*) Mr. Zia's pain, the physician noted, was severe. (*Id.*)

## C. **Alexian Brothers Medical Center**

On December 14, 2004, Mr. Zia visited Alexian Brothers Medical Center (Alexian Brothers), at which time Dr. Montella performed a lumbar epidural steroid injection in his right L5-S1 transforaminal space. (R. at 145.) He decided to undergo this

23

procedure to alleviate his pain and aid in his physical therapy. (Id.) Both pre and post procedure, Mr. Zia was diagnosed as having a lumbar disc herniation. (Id.)

Mr. Zia received another lumbar epidural steroid injection in his right L5-S1 transforaminal space, on December 29, 2004. (R. at 140.) He was diagnosed – both before and after the procedure – as having lumbar radiculitis and a lumbar disc herniation. (Id.)

On January 13, 2005, Mr. Zia received yet another lumbar epidural steroid injection; this time in his right L4-L5 transforaminal space. (R. at 150.) His pre and postprocedure diagnoses remained the same – lumbar radiculitis and a lumbar disc herniation. (Id.)

On April 18, 2005, Mr. Zia returned to Alexian Brothers to have a lumbar CT myelogram done. (R. at 153.) A "mild diffuse disc bulge [was] seen at L3-4, with a mild flattening of the right anterior aspect of the thecal sac as a result." (R. at 153-54.) Additionally, "mild transverse narrowing of the spinal canal due to facet arthropathy" was present at that level. (R. at 154.)

### D. Rehabilitation, Inc.

Mr. Zia visited Rehabilitation, Inc. (Rehabilitation) for physical therapy on many occasions. The record contains assessments and treatment plans consistent with those provided by

24

Mr. Zia's treating physicians. Consequently, the Court will not repeat them here.

**E.    Curtis R. Whisler, M.D.**

On September 14, 2004, Mr. Zia was examined by Dr. Curtis R. Whisler (Whisler).  (R. at 231.)  At that time, Mr. Zia indicated a pain level of five on a scale of ten.  (R. at 233.)  He walked with a normal gait and appeared to be experiencing no acute distress.  (*Id.*)  While he demonstrated negative straight leg raising in his left leg, he did "have pain in his back with straight leg raising of the right leg to approximately 90 degrees."  (*Id.*)  Additionally, he had pain in his right hip area with faber sign and some spasm.  (*Id.*)  Mr. Zia was able to flex seventy degrees and extend to twenty degrees.  (*Id.*)  During the examination, he was able to laterally bend and rotate to approximately twenty degrees.  (*Id.*)  There was no redness, no increased warmth, and no pelvic obliquity.  (*Id.*)  Though he exhibited no trunk shift, he had tenderness over the left posterior aspect of his thigh.  (R. at 233.)  His muscle strength was a five on a scale of five.  (*Id.*)  There was no evidence of sensory loss and Mr. Zia possessed normal deep tendon reflexes.  (*Id.*)  Further, he had full range of motion of the neck and no asymmetry.  (*Id.*)  Tinel signs in the upper extremities were negative and there was no gross neurologic deficit in either the upper or lower extremities.  (*Id.*)  Dr. Whistler diagnosed

25

Plaintiff as having "degenerative disc disease and protruding disc disease by MRI." In addition, physical findings revealed that Mr. Zia had symptoms of low back pain. (*Id.*) The physician suggested that Mr. Zia see a physician more often and undergo epidural steroid injections. (R. at 234.) Further, Dr. Whisler opined that Mr. Zia could do light duty work if "he were able to work part of the day and have intermittent standing and sitting with no heavy lifting." (*Id.*)

## F. Scott A. Kale, M.D.

On February 15, 2006, Dr. Scott A. Kale (Kale) examined Mr. Zia. (R. at 377.) The range of motion of Mr. Zia's cervical spine, shoulders, elbows, wrists, and fingers was normal. (R. at 379.) His grip strength was five on a scale of five. (*Id.*) There was evidence that his lumbar spine was "mildly flattened and mildly tender to palpitation in the right, greater than left lower extremity." (*Id.*) The range of motion of Mr. Zia's knees, ankles, and hips was normal and he was able to bear weight. (*Id.*) His gait was normal, his fine motion intact, and he was able to do tandem gait. (*Id.*) Though Plaintiff stated that he could not bend nor extend his back, he was able to rise from a chair, with little difficulty, without using both hands. (*Id.*) Mr. Zia did not require an assistive device to ambulate. (*Id.*) However, he indicated that he could not heel/toe stand as a result of his back pain, nor could he squat. (*Id.*) It was Dr.

26

Kale's clinical impression that Mr. Zia had "low back pain with radiculopathic features with no EMG and no offer of surgery in the past by the attending physicians." (R. at 380.) Further, Mr. Zia's refusal to engage in "any reasonable motions of his lumbar spine," led Dr. Kale to opine that there was "marked exaggeration of any existing pathology." (Id.)

## G. Charles Kenney, M.D.

On February 24, 2006, Dr. Charles Kenney (Kenney) reviewed Mr. Zia's medical record and subsequently completed an RFC questionnaire, at the request of the Social Security Administration. (R. at 381-88.) He opined that Mr. Zia could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and found Plaintiff's ability to push and/or pull unlimited, other than the aforementioned limitations. (R. at 392.) Dr. Kenney opined that Mr. Zia could frequently engage in climbing a ramp/stairs, balancing, stooping, kneeling, crouching, and crawling. (Id.) However, he suggested that Mr. Zia only occasionally climb a ladder/rope/scaffolds. (Id.) While Mr. Zia could engage in unlimited handling, fingering, and feeling, the physician suggested that his reaching in all directions is limited. (R. at 384.) Dr. Kenney concluded that Plaintiff possesses no visual, communicative, or environmental limitations.

(R. at 384-85.)  His comments reveal that in making his determinations, he relied, in part, on the findings of Dr. Kale.

## 5.  The ALJ's Decision

On June 29, 2007, the ALJ, applying the five-step analysis, 20 C.F.R. Part 404, 1520(a)(f), found at step 1 that Mr. Ridgeway had not engaged in substantial gainful activity since May 12, 2004, the alleged onset date.  (R. at 20.)  At step 2, the ALJ found that Mr. Zia suffered from severe impairments, including degenerative disc disease with no evidence of nerve compression, and mild disc bulge at L3-4.  (*Id.*)  However, the ALJ then found at step 3 that none of Mr. Zia's impairments – alone or in combination – met or medically equaled any of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. at 20.)  In so finding, the ALJ stated that Mr. Zia's back impairment was not accompanied by neurological, motor, or sensory deficits as required by section 1.04A, nor does the record contain findings of equivalent severity.  (*Id.*)

In assessing Plaintiff's RFC, the ALJ determined that Mr. Zia retained the "capacity to perform light work except that he may not climb stairs, stoop or crouch more than occasionally, kneeling and crawling are not limited."  (*Id.*)  In explaining his finding, he noted that the "medically determinable impairments could reasonably be expected to produce the alleged symptoms [Mr. Zia complained of], but that [his] statements concerning the

intensity, persistence, and limiting effects of these symptoms
are not entirely credible." (*Id.*) The ALJ noted Dr. McKenna's
testimony that Mr. Zia's pain symptoms are not proportional with
the objective evidence. (*Id.*) Additionally, though Plaintiff
stated that he needs to lie down throughout the day, his back
curve is normal and he exhibits no signs of muscle spasm. (*Id.*)
Nor were there any clinical findings that would support this
assertion. (*Id.*) Further, it was his belief that Mr. Zia did
not appear to be in great pain at the hearing. (*Id.*)
Consequently, the ALJ found that this claim lacked credibility
and was instead "an exaggerated response to [Mr. Zia's]
condition." (R. at 23.)

Though Mr. Zia's treating physicians documented radiculitis,
the ALJ found no "real evidence" that Mr. Zia has nerve
compression. (R. at 22.) And while there was discussion
regarding surgery, none was performed. (*Id.*) Additionally, the
ALJ did not believe that Mr. Zia's need for frequent rest was
attributable to his pain killers, as Dr. McKenna testified that
they were mild narcotics and as such, he would expect an
individual to develop a tolerance to them over time. (R. at 23.)
While Plaintiff's treating physicians opined that he not return
to work, the ALJ was unsure if they made this determination for
the purpose of workman's compensation or social security. (*Id.*)
The ALJ gave little weight to these recommendations as treating

physicians are inclined to help their patients. (*Id.*) He concluded instead that Mr. Zia is able to, consistent with Dr. McKenna's testimony and the RFC, perform light work with appropriate limitations. (*Id.*)

At step 4, the ALJ found that Mr. Zia is unable to perform any past relevant work. (*Id.*) Finally, at step 5, he considered Plaintiff's age, education, work experience, and RFC to conclude that there are jobs in significant numbers in the national economy that Mr. Zia can perform. (R. at 24.) Therefore, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 409 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting

evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an "accurate and logical bridge from the evidence to [his] conclusion" so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Sims v. Barnhart*, 309 F.3d 424, 429 (2002).

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DIB must prove that he has a disability under the terms of the Social Security Administration (SSA). In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals

one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *(Id.)*

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he is not disabled. He argues that the ALJ's decision should either be reversed or, in the alternative, remanded for additional proceedings by the ALJ.

### A.  Step 2 Determination

Mr. Zia argues that the ALJ erred in his step two determination in finding that the record lacked any objective evidence establishing that he suffered from nerve compression. He asserts that the results of his myelogram, the three epidural steroid injections that he received, and the diagnosis of radiculitis by his treating physicians, provide sufficient evidence that he suffers from this impairment.

At step 2 of the five-step disability inquiry, Plaintiff bears the burden of proof. *Herron v. Shalala*, 19 F.3d 329, 333

n.8 (7th Cir. 1994). To meet this burden, Plaintiff must provide medical evidence that substantiates the assertion of disability. 20 C.F.R. § 404.512(a); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). However, Social Security Ruling 96-7p provides,

> An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her disability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

*See also* 20 C.F.R. § 404.1529(c)(2)

The ME testified that the results of the myelogram performed on Mr. Zia showed a "mild encroachment on the L4 nerve root at the L3-L5, L3-L4 interspace." (R. at 437.) Because the words "encroachment" and "impingement" are synonymous, Plaintiff argues, these results provide sufficient objective medical evidence that he indeed suffers from nerve root compression. The Court disagrees and finds Plaintiff's reliance on the definition of "impinge" provided by the American Heritage Dictionary of the English Language to be misplaced. To be sure, Dr. Montella informed Mr. Zia during his visit on April 21, 2005, that the myelogram showed "no obvious nerve root *impingement*." (R. at 167.) Though neither party provided the Court with *medical* evidence regarding the meaning of the terms, based upon Dr. Montella's notes and the subsequent testimony provided by Dr. McKenna, the Court finds that these words do not share the same meaning. Consequently, the Court finds the ALJ to have acted

reasonably in not considering these results to be objective
evidence to support a finding that Plaintiff suffers from nerve
compression.

Plaintiff next contends that the "results of the various
epidural steroid injections" support a finding that he suffers
from nerve impingement. However, based upon the testimony of the
ME and the operative reports provided by Alexian Brothers, the
Court understands these steroid injections to be a form of
treatment, rather than a diagnostic procedure. Indeed, the
reports reveal that the epidural steroid injections were
performed in an attempt to "help facilitate [Mr. Zia's] physical
therapy and recovery from this pain syndrome." (R. at 140). The
three operative reports contain no reference to nerve impingement
nor any results that were obtained. (R. at 140, 145, 150.)
Therefore, the ALJ reasonably concluded that, in relying on the
reports of his steroid injections, Plaintiff failed to meet his
burden of establishing nerve root impingement.

Finally, Plaintiff asserts that the repeated diagnoses – by
his treating physicians – of radiculitis, provide objective
medical evidence sufficient to meet his burden of proof. The
Court is not persuaded. Though the record is replete with
references to radiculitis, the ME stated that there had been no
procedures done to confirm the diagnosis. (R. at 437.)
Specifically, Dr. McKenna testified, and Plaintiff conceded, that

neither an EMG nor a nerve conducting velocity was performed.
(R. at 435, 437.) It was therefore not unreasonable for the ALJ
to rely on Dr. McKenna's testimony that there was no objective
evidence to establish either radiculitis or nerve root
compression. Further, this result is not changed by the ME's
alleged mistaken testimony as to the results of the myelogram.
It was his testimony that an EMG or conduction velocity – not a
myelogram – was needed to provide the required objective
evidence. As such, the results of the myelogram are of no
consequence on this issue.

While Plaintiff's subjective complaints of pain may not be
disregarded solely due to a lack of objective medical evidence,
the Court finds this not to be the case. Indeed, the ALJ notes
the ME's testimony that Mr. Zia's "symptoms of pain are out of
proportion to objective symptoms." (R. at 22.) A sentiment
echoed by Dr. Kale, who opined that Mr. Zia's complaints of pain
were "marked[ly] exaggerat[ed]." (R. at 380.) Further, when
Plaintiff visited Dr. Whisler on September 14, 2004, he did not
appear to be experiencing acute distress. (R. at 231.) At that
time, Mr. Zia himself stated that his pain level was at five, on
a scale of ten. (Id.) Additional support is provided by Dr.
Kale, who noted the ease by which Plaintiff rose from the chair
in which he was seated. (R. at 377.) The ALJ also concluded
that at the hearing, which lasted in excess of an hour, Mr. Zia

35

did not appear to be in great pain. Though Mr. Zia asserts that he continuously experiences a high degree of pain, the ALJ reasonably found that evidence in the record establishes that the intensity of Mr. Zia's pain is not as great as he professes. Therefore, remand on these issues is not proper.

## B.   Step 3 Determination

Mr. Zia asserts that the ALJ's step 3 determination is not supported by substantial evidence. The ALJ erred, Plaintiff contends, in failing to find that his impairments met or equaled Listing 1.04A.

Listing 1.04 applies to disorders of the spine, "resulting in compromise of a nerve root or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. An individual possesses the required level of severity for this listing if the A, B, or C listing criteria is satisfied. (*Id.*)   Subpart (A) of Listing 1.04, the criteria upon which Plaintiff relies, requires:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atropy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The ALJ concluded that Mr. Zia did not meet the requirements for Listing 1.04A. The ALJ's finding in that regard is supported by substantial evidence. As discussed earlier, the ALJ found that the medical record lacked objective evidence to justify a

finding that Mr. Zia suffered from nerve root compression; a decision the Court found to be reasonable. However, even if the ALJ had found otherwise, Mr. Zia still would not have satisfied the requirements of the listing. The listing requires - if there is involvement of the lower back as alleged here - a positive straight leg raising test. Though he exhibited positive straight leg raising on May 17, 2004, on at least three subsequent occasions, his straight leg raising test was negative. (R. at 132, 136, 233.) Additionally, contrary to the requirements of the Listing, the evidence provided to the Court showed that, on examination by at least two different physicians, Mr. Zia's sensory and reflexes were normal. (R. at 174, 233.) The ME, whose testimony the ALJ found persuasive, shared the view that Plaintiff exhibited no "loss of reflexes," and consequently, failed to meet or equal any of the listings. (R. at 438.) Consequently, the Court rejects Plaintiff's contention that remand on this issue is warranted.

## C.   RFC Assessment

In finding that Plaintiff retained the RFC to perform light work, Plaintiff contends that the ALJ erred. The ALJ, Plaintiff argues, improperly relied on the mistaken testimony of the ME and assigned greater weight to the opinion of the ME than that of his treating physician. The RFC, Plaintiff argues, should be remanded.

37

Plaintiff asserts that the ME's testimony was "based on an erroneous impression of the record." Specifically, he contends that Dr. McKenna mistakenly stated that the "myelogram showed changes on the left side, not on the right," when, according to Plaintiff, the changes were seen on the right. As the Court previously discussed, Dr. McKenna's testimony concerning the myelogram turned, not on what side the changes were present, but rather the fact that a myelogram, rather than an EMG or nerve conduction velocity was performed. As such, the Court finds that the ME's mistaken testimony did not adversely affect the ruling and a remand with regard to this issue is therefore not required.

Further, Plaintiff argues that, since the ME is "only an internal medicine specialist, not a neurologist or orthopedic surgeon," the ALJ improperly gave controlling weight to the ME's testimony. Because Dr. Montella is the treating physician, and a specialist, it is Plaintiff's contention that his opinion should have been given more weight. In determining the weight accorded to a physician's testimony, the extent to which it is supported by medically acceptable clinical and laboratory diagnostic techniques are considered. 20 C.F.R. § 404.1527(d). Because of the treating physician's greater familiarity with the plaintiff's medical condition and circumstances, the ALJ should give controlling weight to the physician's opinion, if it is well-supported by the medical evidence and not inconsistent with other

substantial evidence. 20 C.F.R. § 404.1527(d)(2); *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982). On occasions where the ALJ decides against giving the treating physician's opinion controlling weight, he must articulate logical reasons for this determination. 20 C.F.R. § 404.1527(d)(2); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). Here, the ALJ failed to accept the treating physician's opinion that Mr. Zia suffered from radiculitis and was unable to work. Instead, he adopted the ME's conclusion that the objective medical evidence did not support this diagnosis, and, consequently, Mr. Zia was able to perform light work. In giving the ME's opinion controlling weight, the ALJ noted that he was unsure as to whether the physician's orders that Mr. Zia not return to work were completed with regard to his workman's compensation or disability claim. (R. at 23.) Further, the ALJ was unsure as to whether the physician understood the Social Security definition of disability. (*Id.*) Finally, he noted that the physician may have been biased in his opinion. (*Id.*)

The Court finds the articulated reasons to be logical. To be sure, Dr. Stamelos opined that Mr. Zia should not return to work because "no light duty [was] available." (R. at 135.) An order that was consistent with a workman's compensation claim. Further, by implication, had light work been available, it was the opinion of Dr. Stamelos, that Mr. Zia could have performed

it. Additionally, as the Court has discussed, there is substantial additional evidence contained in the record to support Mr. Zia's ability to engage in light work. And while the Court notes that his physicians repeatedly diagnosed him as suffering from radiculitis, the ALJ was not required to accept this, as the diagnosis was made without any objective evidence. Consequently, because the ALJ provided logical explanations for failing to find the treating physicians' opinions controlling and his conclusion is supported by substantial evidence in the medical record, the Court does not find that remand of this issue is the proper course.

## D. The ALJ's Credibility Determination

Plaintiff contends that the ALJ's failure to consider the factors set forth in SSR 96-7p prior to issuing a credibility determination render the ALJ's credibility determination deficient.

SSR 96-7p states, in part:

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

40

weight the adjudicator gave to the individual's
statements and the reasons for that weight.

The ALJ found Mr. Zia's complaints of pain not entirely
credible because, *inter alia,* "Dr. McKenna testified that the
claimant's symptoms of pain are out of proportion to objective
symptoms" and because "[h]e has no other clinical findings that
would justify needing to lay down as frequently as alleged." (R.
at 22.)

Generally, an ALJ's credibility determination will be
overturned only if the claimant can show that the determination
was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 181 (7th
Cir. 1990). The Court finds that Plaintiff failed to meet this
burden. In the case at bar, the ALJ based his determination, in
part, on his belief that Plaintiff's symptoms were exaggerated.
(*Id.*) This finding is indeed supported by the record. To be
sure, this sentiment was shared by both Dr. McKenna and Dr. Kale.
(R. at 280, 438.) Further, Mr. Zia admitted during a prior
doctor's visit, that his pain was at a five on a scale of ten.
(R. at 233.) Additionally, the ALJ opined that, based upon his
observations during the hour long hearing, Mr. Zia did not appear
to be in great pain. (R. at 23.) As such, it is entirely
reasonable for the ALJ to have relied on the evidence contained
in the record and his own observations, to support his
credibility determination. Consequently, the Court does not find
that the ALJ's determination was patently wrong. Therefore,

remand is not appropriate.

CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment.

Date: December 8, 2008          E N T E R E D:


_Arlander Keys_
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT